Next matter is Beaton v. Franklin Tennis. Mr. Holloway. Good morning. Good morning. May it please the Court, my name is Kenneth Holloway. I'm an associate with Deckert LLP, and along with Ben Barnett, we have been appointed to represent the appellant in this case, Mr. Thomas Beaton. If I may, I would like to reserve two minutes for rebuttal. Surely. This Court's appointment order asks us to brief two specific issues. This morning I would like to address those two issues in the order the Court offered them. First, the District Court abused its discretion by refusing to allow Mr. Beaton a 10-day extension to file a counterstatement of facts in opposition to summary judgment without making any reference whatsoever to whether there was excusable neglect in the late filing. The Magistrate Judge's May 5, 2010, order simply called the memorandum and affidavit in support of late filing, quote, unacceptable. Such a motion for late filing is subject to the excusable neglect standard of Federal Rule of Civil Procedure 6B, but the order makes no reference whatsoever to Rule 6B or excusable neglect. And there's no explanation. Was there any explanation? There was no explanation. The order declared them unacceptable for the reason that the Magistrate Judge felt that the memorandum and affidavit presented in support of the motion stated a different basis than the original motion. Does Pioneer Investment require that there have been a consideration of certain factors here by the Magistrate on the excusable neglect question? It does, Your Honor. That's the next point I was going to make, is that furthermore, whenever excusable neglect analysis comes up, it is governed by the Supreme Court's four-factor standard from the Pioneer case. Was there even a reference to Pioneer Investment? I'm sorry. Go ahead. Was there even a reference to Pioneer Investment? I don't recall. At the district court level? Yeah. No, there was not, Your Honor. But isn't it up to counsel to raise the issue of excusable neglect? I mean, that wasn't raised by Beaton's counsel, was it? That's correct, Your Honor. It was not raised. I'd like to make several points about that. Isn't that a problem? We don't believe that it is a problem. The first point I would make is that the order on the motion for late filing was on May 5th, 2010, and only five days later, on May 10th, did the Magistrate Judge issue his report to which the district court counsel appointed for Mr. Beaton did file objections. That was only a five-day window, and as far as I understand it, the only proper recourse would have been a motion for reconsideration of that May 5th order. What were counsel's stated reasons for the delay or for his latency? Counsel's stated reasons, ultimately, the motion for late filing only included reference to oversight by counsel, which I believe is why. Not a very good excuse, is it? Certainly, it's very incomplete, Your Honor, and that is why the Magistrate Judge, I believe, ordered a memorandum and affidavit. That memorandum and affidavit included, essentially, that the pro bono counsel was working with 111, I believe, paragraph statement of facts and was having difficulty completing it on time. Secondly, that he did not believe... It was 15 pages long, wasn't it? I believe that's approximately correct. Does that strike you as something approximating war and peace? That's not exactly voluminous when we talk about even motions. That's certainly correct, Your Honor, and that was the first basis that the district court counsel stated. The second was a point of confusion as to whether the Middle District of Pennsylvania local rules required a brief in opposition and a counterstatement of facts to be filed simultaneously. And then, furthermore, they did make several statements citing prior case law in which things other than a counterstatement of facts had been given weight in summary judgment analysis. Those were the three points, essentially, made by district court counsel. Can I ask about the finding by the district court that the withdrawal was not a result of misconduct on the part of the defendants? Evidence was put in the record as to how plaintiff thought he was deceived here and how his condition may have led to his lack of clarity or understanding, and yet the district court made that as a factual finding. It seems to me your position on that is pretty strong, but can you find in the record a justification for that determination? A justification for the determination that he did not, that there was no fault on that? Yeah, clearly. I mean, obviously, that's more of a question for your opponent, but I thought I'd give you the first crack to... No, and, Your Honor, that's one of the essential issues with regards to exhaustion and to move on to the summary judgment, and that this is purely a factual issue. And the only thing that I believe that corrections defendants can point to is the statement by Defendant Patashnok, I believe you pronounced his name, that he presented the form that Mr. Bitton asked to discuss that and signed it voluntarily, and that's, I believe, the only thing they can point to. Meanwhile, already in the record is Mr. Bitton's deposition, which luckily for my position the corrections defendants included as an exhibit to their motion for summary judgment, which already includes many points of Mr. Bitton's deposition that create genuine issues of material fact. And for the one that Your Honor is referencing, he did both. Page 260 to 261 of the appendix testified specifically that he was tricked with housing paperwork with one set of documents being placed on top of another in order to have him sign the bottom one while thinking he was signing the top one. And starting at page 168 on the appendix are several letters that he sent through the grievance system, which specifically alleged this trickery starting about 15 days after the withdrawal and continuing for several months of this process. Is it clear that the housing grievance and the other grievance relating to the assault and deliberate indifference were entirely different, different incidents entirely? I'm sorry, Your Honor? Were there two separate grievances here, one for housing, the denial? There was a prior grievance that Mr. Bitton had filed regarding a housing transfer. But that had nothing to do with the incident. That had nothing to do with this incident. And as I believe we acknowledged in our brief, that actually had been resolved a week to two weeks prior to this withdrawal. And we're certainly not challenging that in any respect. The issue is whether Mr. Bitton was capable of understanding that that other grievance had been resolved and that he was dealing with the current grievance. And we're just talking about grievances that were filed and were pending around this particular window of time. Mr. Bitton had filed other grievances, didn't he, during the course of his incarceration? He did file other grievances. He had some familiarity with the process. The corrections defendant cited four grievances that he filed to final review. I would note that two of them are on October 1, 2006, one being the issue in this case and the other being related grievance against the medical treatment. The other two cited by the corrections defendants were actually approximately one year later. The reason I ask this question is, do I recall the chronology correctly here that the grievance that really is at issue in this case, relative to the assault, was filed after the fact of the assault and that there had been no grievances filed prior to the assault that were based upon the alleged threats or words of intimidation spoken? That is correct, Your Honor. All right. Anything else you can say? We could add three minutes to your rebuttal, if you would like. No, Your Honor. I would just like to emphasize the point here that there is no dispute that Mr. Bitton was assaulted and suffered serious injuries, that he has not had the opportunity to have the merits of his claims heard on a fully developed record. Mr. Bitton and his trial counsel? Let me just ask you a question because the district court observed, it says, that Bitton fails to state a cognizable failure to protect claim. I'm wondering if we were to send this back, because the district court misconstrued the factual issue, that we'd come up with that again. Do you think there is a cognizable failure to protect claim here with respect to the padlock and what the prison authorities knew? Your Honor, first of all, I think it's important to recognize that given the incomplete record as a result of the district court's abuse of its discretion in refusing to allow this counterstatement, we don't have all of the answers about that. Mr. Bitton was deprived of an opportunity to present additional evidence that would have made this even clearer. But we can't find out an abuse of discretion. I mean, I'm not sure which way we go, but what if we were to say the court was within its discretion in doing that? Is there enough evidence there? I believe there is enough, Your Honor. And I think the heart of it, again, is in Mr. Bitton's deposition, which is already in the record. As Judge Smith just investigated, there is no prior grievances. So, again, we have to look pretty much just to the deposition. But Mr. Bitton testified that the inmate known as Sharif had a history of violence, particularly a history of violence against white inmates that was well known among the guards. He testified first to an incident in the showers in which he was threatened and immediately told Defendant Porter. Was that a threat? I've been trying to figure out what yo your showers up means. This may have some particularized meaning to the prison setting. I think the prison setting is the key to that, Your Honor. I certainly am not going to stand here and argue that those four words are in a vacuum a threat of violence. But I think coming from an inmate with a history of racial violence directed at a white inmate in that context. But they were temporal. The two instances were temporally remote. They were. The first instance I just referenced was, I don't think we nailed down the date, but it was several months before the assault. Then Mr. Bitton did testify to a much more specific and violent threat approximately a month to a month and a half before the assault. But what was in the record as to what he told prison officials about this? In the record, again, it's only the deposition testimony, Your Honor, but at this stage it's certainly sufficient. He testified that he told, first about the shower incident, that he told Defendant Porter, I'll quote this, look, this dude in here is talking about kicking my ass if I don't get out of the shower. In regards to the second incident a month before the assault, Mr. Bitton testified in his deposition that he told, again, Defendant Porter as well as two other defendants that, quote, this man is going to kill me. He also testified that on that same day he requested a cell transfer. This was an oral request. There is nothing else in the record, but it is in the deposition testimony. Good. Thank you. Thank you very much, Mr. Holloway. Thank you, Mr. Holmes. Thank you. Good morning. Good morning, Your Honors. How are you today? We're great. May it please the Court, my name is Tim Holmes and I'm here for the appellees in this matter. We may argue exhaustion, we may argue excusable neglect, but Mr. Bitton has not and cannot prove that he has an Eighth Amendment claim. There was no pervasive risk of serious harm to Mr. Bitton. He cannot prove that the appellees knew of that harm, and most significantly he cannot prove that they drew the inference that he faced a significant harm. Well, but he did testify that he told them, and he testified that he requested a cell transfer. So he put them on notice of the fear he had for his life, correct? He put them on notice of the threats to him. But my contention is that those threats do not rise to the occasion or to the level of being a serious threat of pervasive risk of serious harm. So what did he put them on notice of? Is yo-yo showers up a threat? Do you know? No, sir. It is not. This is a penitentiary, Your Honor. This is not the seminary. Yeah, I was getting to that. Well, certain religious orders can argue pretty vehemently, too. But on the merits, can't just about anything be fashioned into a weapon in the prison setting? Absolutely, sir. I mean, I'm shocked to learn that prison administrators choose to use padlocks. It seems to me not to be terribly surprising. So do I understand, and this may be a question I should have asked of a plaintiff's appellant's counsel, but that there are really two risks that are at issue here, one being the risk posed by the exchanges between Sharif and Beaton and the other being a risk posed by the presence of padlocks? Yes, sir. I believe that to be the case. And your position is that with respect to Sharif, these, even if they're threats, are not pervasive or frequent enough, that there's a risk there that would rise to a level that would put or ought to put the prison administrators on notice of a significant danger. That is correct, sir. And the other being that padlocks simply, in and of themselves, do not represent a risk in the prison setting. That is correct as well. Not only do they, well, you've said it, you've summarized it very well, Your Honor, that's fine. And they serve a useful purpose in the prison setting as well. That is what I was going to add to your statement. He testified that prison officials did acknowledge to him that padlock assaults were a problem at the prison. So that heightens it and gives rise to the concern of, well, maybe they should have done something about it. We don't know the total level of the problem. Well, we have his testimony to that, and then we also have that person's signed declaration where he said he had no knowledge of the padlocks being a problem, that they did not discuss padlocks being a problem at their meetings. And if you'll notice, Mr. Beaton had this conversation with Major Morris after the fact. Major Morris has to know of the problem prior to the fact. Well, but you assume if he had acknowledged that they were a problem, maybe it's a wrong assumption that it persisted. But these are fact issues, aren't they? Maybe they should go to a jury. Well, perhaps, Your Honor. I do not think so. I think I have very strong arguments to say that it is not a factual issue, that it should not go to the jury. Because, again, even if he says that they were a problem, what's the problem? Well, that could be further developed. We already have his testimony, Your Honor. Discovery has closed. How are we going to develop it? At trial, that they are a problem. Presumably you develop these things at trial. Somebody says it's not a problem. Somebody says it is a problem. We have every person, I believe, every person who signed a declaration said that they were not aware of padlocks being a problem. Mr. Beaton's own testimony can at best be taken to be that he was aware, he was aware, of four padlock incidents or assaults. Isn't that correct? Yes, sir. Wouldn't the burden be on him to demonstrate, for instance, that a padlock, which, as Judge Sirica's question pointed out, has perfectly legitimate uses, that's why it's there, represents a greater danger than certain other instruments of assault? Shanks, for example, which I would just intuitively think have a much greater incidence and frequency of use. I believe so, yes, sir, Your Honor. And if I may, we're still at summary judgment, and plaintiff has made his argument or pled his case, and then I have refuted that or my clients have. He really must go beyond then of just saying, well, that's not the way it happened, or I told somebody. He has to demonstrate some type of substantial evidence, or perhaps that's not the precise word, but he has to go beyond a more scintilla of the evidence, a bold assertion to say, that's not the way it happened. I told him this, and this is what he said. What about the second statement by Sharif? I'm going to F you up. I believe if I were standing next to Mr. Beaton and I were Mr. Sharif, and as described, if he is a guerrilla, and if he was looking down at me and said, I'm going to F you up, sorry, I have to say that, I'm going to F you up, that could perhaps be seen as a threat. But even if he said that in that manner, even if you take that to be true, it's a little disingenuous that he said that to Mr. Sharif when nothing happened at that time. It was a month and a half later that Mr. Sharif actually assaulted Mr. Beaton. But does he, and there's no evidence that Beaton told the correctional officers about that statement? No, sir, none. In fact, all the corrections officers that Mr. Beaton says he claims to have mentioned this to, they say it never happened. Let's even take the threat, if you will, on its face. Doesn't the prison context even require more from Plaintiff Beaton on that point? Because as you point out, this is a prison. Again, I've never been incarcerated, but I've spent a lot of time visiting prisons. These are not charm schools. The interactions between incarcerated people are often not pleasant. So does every single threat of that nature require that the warden place the person making the comment or threat in some kind of special unit? And wouldn't there be a burden on the plaintiff to show that this threat is above and beyond the ordinary discourse, that it represented some kind of immediate threat of being carried out to him, just something more than the words? I believe so, Your Honor, and I think this Court has held that similar standard, saying that it cannot be just a verbal threat. There has to be more to it than that. Imminency of some danger. Yes, sir. Anything else you want to tell us? Well, it was a pleasure to be here. If you have any other questions for me. You're resting your argument on the lack of a meritorious case here, more on the exhaustion. Would you like to discuss excusable neglect at all? I have something to say about that. Good. Tell us. If I may, if you look at the entire process, I filed a brief arguing exhaustion and also arguing that there was no Eighth Amendment claim. In that brief, I made significant references to and included the statement of facts. That in and of itself should have highlighted opposing counsel that perhaps I should include a statement of facts or I should at least respond to those statement of facts. Two extensions of time later, opposing counsel files his brief in response, making absolutely no reference to his statement of facts. None. He included references to the amended complaint. And he also included exhibits with his brief in response. Now, if he were going to provide a statement of facts, if he truly thought it was an oversight, why wouldn't he cite to the statement of facts in his brief? And why would he include facts other than what you would normally include? Why wouldn't he include these exhibits that he included with his brief in response with the statement of facts? So the district, I'm sorry, the magistrate judge says that, I'm sorry, procedurally, then I, after about 10 days, file my brief in reply. And in that, I make note that he has not responded to my statement of facts. Then and only then does opposing counsel say, I'm sorry, it was an oversight. I forgot to respond to the statement of facts. He doesn't say that he misread the rule. He doesn't say that mine were too long. And he doesn't say that they were half done. I just couldn't finish them. Was there any prejudice to accepting late filing? I think there is prejudice, yes, sir, Your Honor. I'm glad you asked that. And it would seem innocuous, you know, what's another five or 10 days to do the statement of facts? First off, there is a, it's already been approximately three and a half years for the case to proceed this far. Memories fade. Evidence dwindles, is lost. People retire. Well, but that would have been the same if he had filed it 10 days earlier. No, sir. Actually, Superintendent Tennis was in the process of retiring at that time. Also, it's a disservice to my other clients. Many times we have cases where I must drop everything for an inmate who the judge has vacated the order, and he should be released immediately. I don't think it's fair to that inmate then for me to say, oh, well, hold on, spend another couple days in jail,  I'm not sure that argument carries. It may not be my strongest argument, Your Honor, but it is true. We have guardianships where inmates are incapacitated and incompetent, that I must then attempt to get a guardian appointed for them. That's very spur of the moment as well. I drop everything else and try to save this inmate's life. Just two weeks ago, we had what would commonly be called compassionate release. Technically, there is no such thing as a compassionate release. If you'll read Statute 42 PACS 9777, if an inmate is terminally ill or seriously ill, he can be released to a hospital, a hospice, or a long-term care center. I had to attempt to have this inmate released through compassion, to have him released outside of our custody to a hospice so that he could die with dignity. All of these, I do all of these things. So it's a disservice to the other clients to say, please wait. And I think that client, or I'm sorry, opposing counsel did show bad faith in making the motion. May I ask you quickly about one other point, and that is the procedural default. You concede, do you not, that the district court was wrong in holding that Mr. Beaton procedurally defaulted because of some failure to supply documentation? I believe to say I concede goes against the grain, Your Honor, but I believe that he probably did, yes, sir, Your Honor. Okay. I think the court has plenary review now. You could look at it and say, well, the grievance was untimely. He filed it too late, so he didn't exhaust. You could find that he actually did withdraw the grievance, and he was under no undue pressure from Defendant Petitioner. He didn't exhaust. And you could find that he didn't follow the proper procedures. If you look, my argument against what you asked me, Your Honor, would be if you look at the process, he withdrew the grievance. Whether he did so of his own accord, let us put that aside. He withdrew the grievance, and then he writes a letter to Superintendent Tennis saying, I would like to refile the grievance. Well, but the presumption you're saying when he withdrew the grievance, he says, I was tricked. All right. I signed a paper, and I was tricked. So I don't think we can conclude that he voluntarily and knowingly withdrew the grievance. I mean, we'd have to be totally making a credibility determination at this stage. I believe that. That would be accurate, Your Honor. Okay. Anything else? No, sir. Thank you very much. We ask that you rule in our favor. Thank you very much, Mr. Holmes. Mr. Holloway. Thank you, Your Honor. If I may just make three very brief points. The first, to address the issues about misfiled paperwork or untimely filing. I think as we briefed, those issues, despite the plenary review at this stage, do not weigh against my client. First of all, though counsel raised that the grievance was originally filed untimely, there's no question that it was accepted for a final review, that one of the guards was directed to investigate, and the incident with the withdrawal was part of that investigation. So I think it's clear that that has been waived. Furthermore, the issue with Mr. Vuitton's grievance being kicked out for a lack of compliance with what needed to be filed is really a matter of mistake. The last letter from the office, from the grievance office, denying Mr. Vuitton's appeal to refile, essentially apologized for that misunderstanding. He had not sent an initial report in because an initial report had never been done, because he had withdrawn the grievance. And the last letter from the grievance office acknowledged that misunderstanding, then said the reason for this denial is that you cannot appeal a withdrawn grievance. So I don't want us to get caught up in that. The second point is that I think the opposing counsel's discussion highlights the fact that this is a fact-driven and fact-disputed case. I'd also note, as we briefed, that discovery regarding the padlocks was being pursued and not completed at the time that Mr. Vuitton's counsel sent his brief in opposition to summary judgment. Obviously, the discovery deadline had passed, but both sides acknowledged that it was ongoing and that they expected additional depositions to be taken. Were those depositions taken? No, ultimately no more depositions were taken. Because the district court ruled? Yes, because the district court ruled. Second, I just want to clarify on that point, when opposing counsel was asked whether there was evidence that Mr. Vuitton had informed the yards about his second threat, I believe opposing counsel responded with no and then proceeded to acknowledge a factual issue. He said no because these three defendants all have affidavits that said they weren't aware of it. Meanwhile, Mr. Vuitton has a deposition in which he specifically said he spoke to all three of them about it. Finally, my last point is that I'm not here to say whether Mr. Vuitton's counsel at the trial level did a good job or did a bad job or approached a summary judgment in a right or wrong way. But the question here is whether Mr. Vuitton should be the one to pay the price. The reasons for late filing maybe were not well articulated, but that's irrelevant under Pioneer. I just want to stress that the Pioneer factors, excusable neglect, Rule 6b, were never referenced, relied on, or applied by the district court at any level and that that in and of itself is enough because that formed a basis for summary judgment. That is enough in and of itself to reverse a ruling on summary judgment. Good. Thank you very much, Mr. Holloway. We thank both counsel for a very helpful argument. Take the matter under advisement.